UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| PAMELA WALKER and BRENT HOUSER, individually and on behalf of all others similarly situated,<br>   Plaintiffs,<br><br>  vs.<br><br>FLOYD COUNTY, INDIANA, and DARRELL MILLS, individually and in his official capacity as Floyd County Sheriff, and RANDY HUBBARD, individually and in his official capacity as former Floyd County Sheriff, and STEVE KNIGHT, individually and in his official capacity as Floyd County Jail Commander, and JOHN and JANE DOES, Nos. 1, 2, and 3, individually and in their official capacities as medical professionals, officers and employees of the Floyd County Jail,<br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 4:07-CV-0014-SEB-WGH |

**ENTRY DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

  Before the Court is the motion for preliminary injunction filed by Plaintiffs, Pamela Walker and Brent Houser. Docket No. 22. Both Plaintiffs are currently inmates at the Floyd County Detention Center ("the FCDC") who allegedly acquired infectious diseases while incarcerated, specifically, Ms. Walker acquired a staph infection[1] and Mr.

---

  [1] Plaintiffs' Exh. 12 is Ms. Walker's medical record which states that her principal
(continued...)

Houser acquired celluitis.[2] Plaintiffs' request for relief is broad in scope and general in nature as they seek "a declaratory judgment deeming unconstitutional any and all . . . policies, procedures, customs, or practices which resulted in [Plaintiffs'] incarceration under conditions in which they could acquire infectious diseases and further request that this Court permanently order Defendants to . . . conform their conduct to the requisites of the Constitutions of the United States and Indiana and to applicable Indiana laws and regulations, and to alleviate all jail conditions that contributed to the damages sustained by Plaintiffs and the class." Amended Compl. at ¶ 34; Docket No. 29.

This motion has been fully briefed by the parties and a hearing conducted on June 26, 2007.[3] For the following reasons, we DENY Plaintiffs' motion for a preliminary injunction.

---

[1](...continued)
diagnosis is cellulitis and her secondary diagnoses are "Tobacco use disorder," "Bacterial infection due to Staphylococcus aureus" and "Infection with microorganisms resistant to penicillins."

[2] While Plaintiffs seek class certification of their complaint, a class has not yet been (and may never be) certified by this court; therefore, this motion for preliminary injunction applies only to Plaintiffs individually and not to any future class.

[3] We note as a procedural matter that neither party requested an opportunity to submit post-hearing briefings to the Court. Following the hearing, with the Court's urging, the parties reportedly engaged in discussions concerning a possible consent degree being reached among them. When those discussions failed to achieve an agreement, the Court was informed. This ruling follows.
   At the hearing, Plaintiffs Pamela Walker and Brent Houser appeared in person and by counsel, and Defendants Mills and Knight appeared in person and by counsel, and the other defendants appeared by counsel only. Crystal Stubbs, Brent Houser, Pamela Walker, Paula Denton, and Dr. Julio Rameriz were called as witnesses on behalf of Plaintiffs. Defendants called Margaret Lewis and Jason Kerberg as witnesses.

FACTUAL BACKGROUND

Plaintiff Pamela Walker, a twenty-five year old woman, was incarcerated in the FCDC in October 2006 for a three week period. Prior to her incarceration, she believes that she never experienced a staph infection. Ms. Walker served her time in a dormitory-style cell with common toilets and showers. She asserts that the crowded nature of the cell made it "impossible to avoid physical contact" with the other inmates. Pls.' Memo in Supp. at 1. On such inmate was Crystal Stubbs, who slept in the bunk above Ms. Walker and "had open, oozing boils on her buttocks" as a result of Methicillin-resistant Staphylococcus aureus ("MRSA"), a strain of bacterial infection that is resistant to antibiotics. Id. at 2. Approximately one week or more after her detention, a staph infection became visible under Ms. Walker's right arm and on the back of her right and left thigh. Ms. Walker believes that this staph infection was MRSA and that she acquired it from living in proximity to Ms. Stubbs.

Ms. Walker testified that she submitted three medical requests before she was allowed to see the nurse, Ms. Margaret Lewis, as well as Dr. Canon, M.D., who prescribed Sulpha drugs and a vitamin. She was told, at least initially, that the staph infection was possibly spider bites or boils. Ms. Walker was given Epsom salts for hot soaks and gauze and tape to cover her wounds. Ms. Walker testified that Dr. Canon explained the procedure for performing the hot soaks using the Epsom salts but did not caution her regarding the contagious nature of her condition.

After her return to the cell block and during the course of managing her condition,

3

Ms. Walker found that her sores produced large amounts of discharge which routinely soaked through the bandages. Another inmate named "Shirley" helped changed Ms. Walker's bandages and assisted her with the hot compresses. After the bandages were changed, the women would place the soiled gauze in separate bags for disposal on the unit.

When she was released from FCDC on November 3, 2006, Ms. Walker went directly to the Clark County hospital where she was admitted and required several days of in-patient treatment, including excision of her sores. In January 2007, Ms. Walker was returned to the Floyd County Detention Center where she was provided the same drugs that she had received at the Clark County Hospital. (See Hospital Records at Exh. 12, 13, and 14.) Ms. Walker testified that while incarcerated she was never provided information about how to maintain personal cleanliness and, though provided a copy of the FCDC handbook, she did not read much of it. She also admitted that she never asked any medical officer including the nurse to assist by changing her bandages nor did she request to see any medical official about this condition.

Crystal Stubbs

Crystal Stubbs is a 34-year-old resident of New Albany, who alleges that she contracted MRSA at Clark County Jail and was thereafter transferred from the Clark County Jail to the FCDC sometime in July of 2006. At the time of her transfer, she exhibited no visible signs of MRSA, and upon entering the FCDC she failed to report on her medical questionnaire that she had MRSA. In August of 2006, the infection presented

as two boils on her buttocks. When she submitted a call slip request to see the nurse for treatment, no response was forthcoming for three days. When she did finally see the nurse, Ms. Margaret Lewis, Ms. Stubbs told her that she had acquired the MRSA infection, for which she was given "Bactrim," an antibiotic ointment, bandages, tape and Epsom salts to soak the wound. She testified that she enlisted the help of another inmate, Angela Foster (Ms. Stubbs's cousin by marriage),[4] to change her bandages, which procedure was performed in the corner of her cell block area four times a day for seven successive days and, after changing the bandages, they would place them in a separate bag for placement in a biohazard bag on the cell block unit, which container sometimes required a few hours to secure. Ms. Foster testified that the nurse gave her protective gloves the first day but none were provided thereafter. The nurse also told her to keep her hands clean but provided no additional instructions on the method for doing so. She incurred a second outbreak in October 2006 with sores developing under both arms, but those inflammations never transformed into open sores. In November of 2006, Ms. Stubbs was seen by Dr. Cannon for the removal of a wart, during which treatment he confirmed that she had acquired a staph infection under her arms and prescribed Epsom Salts and antibiotics.

Ms. Stubbs was released from FCDC on November 26, 2006, and remains at liberty as a resident of New Albany. She acknowledged on cross-examination that she is not familiar with current jail procedures.

---

[4] Ms. Stubbs does not believe that Angela Foster developed a similar infection.

Brent Hauser

Brent Hauser is 39 years old and serving a four-and-a-half-year sentence in the FCDC. He is currently detained in E Block, which is a residential unit housing 42 men in 38 cells. Each cell has its own bunk and toilet. Those detainees who are not assigned a cell have mattresses four inches thick which are placed on the floor for sleeping (none of the inmates are provided sheets) and have access to any of three toilets in a common dayroom. There are three showers to serve all the inmates housed in E block.

Between 2006 and 2007, Mr. Hauser was a Trusty of the FCDC, a position which permitted him special duties. One such task was to assist with the daily laundry. While completing his laundry duties, Mr. Hauser noticed that "Gary," the Trusty assigned to the laundry detail prior to his shift, evidenced signs of the bacterial infection, cellulitis. Gary's infection was, in fact, so severe that he required transport to the hospital in a wheelchair where he remained for three days of medical treatment. Thereafter, Mr. Hauser also developed cellulitis, which outbreak began near his foot and moved up his leg towards his knee. He was taken to Floyd County Hospital for treatment and, upon his return to the FCDC, in December 2006, he was seen by Dr. Canon, who prescribed antibiotics for him.

Paula Denton

Paula Denton is a 34-year-old inmate at the Floyd County Detention Center who was incarcerated on March 2, 2007. Ms. Denton provided assistance to Laura Tabor, who

resided in the same cell block (cell block G), in managing her oozing, pus-filled sores by placing bandages over them during a two week period. Four weeks later, Ms. Denton herself developed an infection in two locations, one behind her ear and one on her thigh. She testified that she reported the onset of her infection to the medical staff and over the course of two weeks made several requests to see a nurse. During that time, she applied antibiotic soap and ointment to the area.[5] Eventually, after Ms. Denton's sores opened up, she was provided gauze, ointment, and tape for the wounds (but no antibiotic medication), all of which she applied to and for herself. Like others similarly affected, she too placed her dirty dressings in the trash container located on the unit. Currently, she continues to treat a sore on the back of her left leg which has not opened up, but is nonetheless painful. A bump also has recently developed near her left eye for which she applies an alcohol wipe, supplied by the nurse, to clean the area. Ms. Denton testified that she has not been treated for the infection since March of 2007.

<u>Cleaning at Floyd Country Detention Center</u>

According to the testimony of the first shift supervisor, Jason Kerberg, the cellblocks at the FCDC are divided into two wings. The majority of the male residents are housed on the west side of the jail where each person is assigned to an individual cell in which there is a toilet. On the east side of the jail, two cell blocks of females are housed in F and G blocks. The approximately twenty-five women have access to two

---

[5] It is unclear if Ms. Denton acquired the soap and ointment from jail staff or on her own.

toilets in F block, and twelve to fifteen women have access to only one toilet in G block.

FCDC daily provides cleaning supplies to the inmates to clean their cells. Mr. Kerberg testified that cleaning supplies are passed out each evening at 7:00 p.m. The supplies provided on the cell blocks include three spray bottles (one filled with a glass cleaner, one with a general disinfectant spray, and one with Dawn soap and water to clean the showers). The disinfectant spray is supplied by Betco System and is designed to kill both staph and HIV. He said that when these supplies run out, he makes sure that the bottles are refilled so they are available at all times. However, for safety reasons, the inmates are not provided bleach or gloves. Three rags, toilet bowl cleaners, mops, and buckets are also supplied to each cell block.

The inmates' testimony is substantially similar to Mr. Kerberg's regarding the cleaning practices. Ms. Walker stated that cleaning supplies are brought into the block after dinner for a few hours. She recalled that one bottle of cleaner is always present in the block (although she noted it is sometimes empty), and an additional three spray bottles, one bucket, mop and at least one broom are also provided at other times during the day. Ms. Denton also testified that cleaning materials are delivered to the cell blocks between 7 and 8 p.m., including three bottles of cleaning solution, two rags, a bucket and mop as well as additional supplies to be used as needed during the day.

Mr. Hauser testified that he receives clean clothes, including underwear, once or twice a week and confirmed that cleaning supplies are distributed to each cell block every evening, which include four spray bottles filled with a neutral disinfectant antibacterial

liquid solution, two mops and two mop buckets with the antibacterial solution as well as three rags.  In addition, (during the prior eight months) spray bottles with cleaning solution and two rags were available in the cell block 24-hours a day for inmates' use.  Mr. Hauser stated that there are often not enough cleaning rags and at times not enough cleaning solution to go around for all of the inmates to use.  He also stated that the showers, which are required to be cleaned by the inmates, often evidence mold on the walls.

Dr. Julio A. Ramirez

Dr. Ramirez, M.D. is a Professor of Medicine and Chief of the Division of Infectious Diseases, University of Louisville.  He is also the director of infection control at the University of Louisville Hospital and at Kindred Hospital.  Dr. Ramirez explained that staph is the primary bacteria affecting humans and staph MRSA is a form of staph that is highly resistant to antibiotics.  The most common symptom of a staph infection is a skin infection, such as cellulitis or an abscess.  He stated that staph MRSA usually first appears on the skin as swollen, red, necrosis – resembling a spider bite or a boil.

Dr. Ramirez testified that the successful treatment of staph depends on the particular area infected and that the typical treatment is some form of antibiotics.  Staph is transmitted through person-to-person contact or by an infected person touching an object which is subsequently touched by another, who thereby picks up the bacteria.  The point of greatest infectiousness is when contact is made by another with the area of abscess and/or with draining lesions.  Staph is not transmitted through the air, only by contact,

making cleanliness key to any efforts to contain or otherwise control it. Dr. Ramirez testified that the risk of contamination exists whenever a person with staph is being treated.

Dr. Ramirez also opined that staph is a relatively easy condition to diagnose. The procedure for determining whether a red swollen spot on the skin is staph, rather than a spider bite, for example, is to do a culture of the wound and submit it for laboratory analysis. However, if no point of irritation is visible on the skin, then it is difficult to diagnose the presence of staph. Although diagnosis is ordinarily a simple process, there is no conclusive research concerning how best to treat staph, and reasonable physicians disagree regarding the best course of treatment. Dr. Ramirez believes that, when diagnosing and treating staph, it is important to respond quickly with antibiotics in order to prevent its transmission. Dr. Ramirez acknowledged on cross examination that trivial skin infections are treatable with sulpha drugs and without prescribing antibiotics. See Exh. 2.

In an article authored by Dr. Dean Rieger, M.D., Medical Director at Indiana Department of Corrections, and Dr. Joseph Bick, M.D., Chief Medical Officer at California Medical Facility, entitled <u>Spotlight: So Your Facility Has CA-MRSA</u>, it is written:

> The indiscriminate use of antibiotics can lead to increased drug resistance and should be discouraged. In many cases, drainage and appropriate wound care will suffice. If used, antibiotics should be selected that are known to be effective against MRSA. Trimethoprim-sulfamethoxazole

10

>  (Bactrim, Septra) . . . is usually effective in patients who have MRSA.

See Plaintiffs' Exh. 1.

Dr. Ramirez noted further that persons suffering from diabetes, or users of intravenous drugs, or people experiencing prolonged hospital stays or those who use antibiotics over a long period of time are most susceptible to MRSA. Warm and moist environments are conducive to the development of staph, including such crowded places as jails, football locker rooms, and day care centers.

In treating patients who have staph infections, Dr. Ramierz indicated that he would generally attempt to educate the patient and the people living in proximity to the patient concerning this condition. He would take steps to keep the wounds clean and dry, and apply treatment products such as microbials. To reduce transmission, Dr. Ramirez recommends screening the population groups, providing education and instruction to them, and providing a thorough cleaning of the area using antimicrobial and antibacterial products where the bacteria might be found to exist.

Margaret Lewis, RN

Margaret Lewis is a registered nurse who has worked at the FCDC for seven and a half years. She testified that pod officers receive the requests of inmates for attention from a medical officer and that it is her practice to respond to all requests if possible within two to three days or, if it is an emergency, within 24 hours. Dr. Daniel Eikenburger, M.D., is the staff physician who, since January 1, 2007, has seen patients at

the jail's medical center on Tuesdays and Fridays from 7:30-8:00 a.m. The inmates are assessed a $15.00 co-pay fee for services for physician treatment; there is no charge for them to be seen by the nurse. No one is ever denied treatment, however, due to a lack of funds. In addition, there is a $15.00 co-pay for prescriptions, which is also waivable for those unable to pay. The FCDC maintains two padded cells for inmates deemed to be threatening to themselves, whose occupants are monitored 24-hours a day. The FCDC has space available to isolate particular inmates in four separate holding cells, as needed.

Ms. Lewis's understanding of the FCDC's policy for dealing with inmate staph infections is that isolation is not provided for the afflicted inmates because it is not deemed necessary, although steps must be taken to ensure that all open wounds are covered. This policy reflects the medical opinions of Dr. Rieger and Dr. Bick who have written: "Except for patients with secretions that cannot be controlled and are likely to contaminate the environment (including prisoners who intentionally spread contamination), no special separate housing is necessary." Pls.' Exh. 1.

In February of 2007, Ms. Lewis formulated FCDC's policy for treating infections to conform to Dr. Eikenburger's instructions. Def.'s Exh. Q. Ms. Lewis testified that, when an infected inmate presents with staph, she follows the steps outlined in the following procedure.

1. If a wound is draining, a culture is performed.
2. Hibiclens soap is supplied for the inmates' use during baths and showers, with instructions not to get the soap in eyes or ears.

3. The wound is covered with a gauze bandage. Dirty bandages are deposited in the red bio bag.

4. Disinfectant is available for use in cleaning the toilet and showers after use.

5. Inmates are told to see the nurse or medical officer, if having problems with wound.

6. Inmates are instructed to remember that staph germs are spread from one person to another by touching. They should be sure to wash hands well after touching infected skin or handling wound dressings. Washing hands is the BEST way to prevent the spread of germs.

Def.'s Exh. Q.

When a culture of the infected area is extracted, it is transferred to Floyd Memorial Hospital where a sensitivity report is conducted to identify which medications will be effective in treating the infection. The jail nurse provides Epsom salts to the infected inmate with an explanation as to their use and to bandage the wound, apply antibiotic ointment, dispose of the gauze pads, and wash hands properly. If inmates have difficulty with any of these procedures, they are instructed to notify her so she or another staff member can provide necessary assistance. The FCDC uses "hibiclens," an alcohol based antibacterial cleaner, for skin washings. Nurse Lewis testified that she assumes at the outset that all bumps are staph and gives treatment instructions on that basis to the inmates for them to follow in caring for themselves.

Plaintiffs' complaint centers around the alleged lack of precautions taken by the

FCDC to prevent the spread of staph infection to Mr. Hauser and Ms. Walker. Plaintiffs maintain that the FCDC should do more in terms of education and training of inmates regarding infectious diseases, performing necessary cleaning of living areas to reduce transmissions of bacteria, and providing more aggressive treatment for those infected.

We turn now to address the merits of Plaintiffs' motion for preliminary injunction.

## PRELIMINARY INJUNCTION STANDARD

"As the Supreme Court has observed, '[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" Christian Legal Society v. Walker, 453 F.3d 853, 870 (7th Cir. 2006), quoting Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). To justify this relief, movants must show that (1) they have a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not be inimical to the public interest, which includes the interests of any persons who are not parties to the case. Christian Legal Society v. Walker, 453 F.3d 853, 870 (7th Cir. 2006), citing Joelner v. Vill. of Washington Park, 378 F.3d 613, 620 (7th Cir. 2004), Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1067 (7th Cir. 1994); see also Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 11-12 (7th Cir.1992).

The court must weigh all of these factors in exercising its equitable discretion,

"seeking at all times to 'minimize the costs of being mistaken.'" Abbott Laboratories, at 12, quoting American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589, 593 (7th Cir. 1986). This approach has been described as a sliding scale approach in which the relative strengths of the parties' positions and the degree of threatened harms are balanced against each other. Promatek Industries, Ltd. v. Equitrac Corp., 300 F.3d 808, 811 (7th Cir. 2002); Abbott Laboratories, 971 F.2d at 12 & n. 2; Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 387 (7th Cir. 1984).

The gravamen of Plaintiffs' claim here is that Defendants are continuing to violate their rights under the Eighth Amendment by exposing them to a highly contagious and painful infectious disease, in violation of 42 U.S.C. § 1983. Plaintiffs' memorandum in support of their motion for preliminary injunction asserts these claims under a deliberate indifference theory. See Pls.' Memo at 5-7, citing Farmer v. Brennan, 511 U.S. 825, 832 (1994); see also Hall-Bey v. Ridley-Turner, 2007 WL 1513998, *2 (7th Cir. May 23, 2007).

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer, 511 U.S. at 828. A prison official is deliberately indifferent "if he know that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the 1983 risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is

15

to ensure "'reasonable safety.'"  Farmer v. Brennan, 511 U.S. 825, 844-845, 114 S.Ct. 1970, 1982 - 1983 (1994), quoting Helling v. McKinney, 509 U.S. 25, 33, 113 S.Ct. 2475, 2481 (1993).

In Jones v. Drew, 2007 WL 737359 (7th Cir., March 12, 2007), the Court addressed the medical needs of one Charles Jones, a prisoner in custody by the Illinois Department of Corrections (IDOC), who suffered from bunions.  He brought suit alleging that various doctors and non-medical prison officials violated his Eighth Amendment rights when they responded to his bunion problem only with "conservative treatment," rather than with alternative treatments, such as surgery.  The defendants maintained that there was no evidence that they were deliberately indifferent to Mr. Jones's bunion problems.  All four defendants, though they lacked medical training, clearly had relied on the expertise of the medical directors in concluding that Jones's grievance should be denied.  Accordingly, the Court ruled, they were not deliberately indifferent to Jones's medical problem.  Jones, at *3.  The Seventh Circuit specifically held that a doctor's preference for a less costly treatment is not evidence of deliberate indifference unless such preference is "so inadequate that it demonstrate[s] an absence of professional judgment, that is, that no minimally competent professional would . . . so respond[] under those circumstances."  Jones v. Drew,  2007 WL 737359, *4 (7th Cir. 2007), citing Collignon v. Milwaukee County, 163 F.3d 982, 989 (7th Cir.1998).

The parties in the case at bar do not dispute that penicillin-resistant staph infection (MRSA) presents a serious medical condition.  See Pls.' Reply at 4.  Evidence discloses

without controversy that some strains of the virus can be extremely painful and lead to permanent disfiguration, even death. Pls.' Reply at 8. The risk of contracting MRSA has been identified by other courts as the type of condition which can qualify as the basis for a medical indifference claim. See e.g., Lopez v. McGrath, 2007 WL 1577893 (N.D. Cal. 2007) (slip opinion), Kimble v. Tennis, No. 4:CV-5-1871, 2006 WL 1548950, at *1 (M.D. Pa. June 5, 2006); Cunningham v. Belleque, No. CV-03-1239-MO, 2006 WL 468377, at *3 (D. Or. Feb. 24, 2006). However, "the mere existence of MRSA in the abstract does not satisfy the 'substantial risk' prong unless the 'risk' of becoming infected is 'substantial.'" Lopez, 2007 WL 1577893 at *13.

    Here, the parties disagree regarding whether Plaintiffs faced a substantial risk of contracting MRSA based on the conditions they encountered at the FCDC. Plaintiffs argue that cleaning protocols at the FCDC are inadequate in preventing the spread of staph which places the inmates at a substantial risk of contracting MRSA. Plaintiffs specifically cite the insufficiency, both in quantity and quality, of cleaning products supplied by FCDC which virtually assures that toilets used by a person infected with staph can not "be cleaned regularly and between every user if necessary." Pls.' Reply at 6, citing Staph Guidelines at 3. In addition, Plaintiffs contend that clothing, bedding and towels are issued only on a weekly basis, which frequency is "inadequate to control the spread of staph bacteria." Id., citing Def. Resp. at 9. Further, Plaintiffs assert that inmates are not properly instructed on treatment methods to cure or control their staph infections, including the most effective ways to change their bandages. Pls.' Reply at 6.

Plaintiffs final contention is that infected inmates should be segregated from the general population during the time(s) of their affliction. Pls.' Reply at 7.

Defendants respond, contending that Plaintiffs did not and do not confront a substantial risk of contracting MRSA or any other staph infection while housed at the FCDC. In fact, the evidence adduced at the hearing disclosed that Crystal Stubbs, who was transferred from Clark County Jail to FCDC, brought MRSA with her, even though Pamela Walker suffered her MRSA outbreak at the jail. There was evidence that Paula Denton and Brent Hauser each developed a staph infection at the jail, but there was no evidence that it was MRSA strain of staph. Dr. Ramirez's testimony established that staph is spread through contact with a person or object carrying the bacteria, but, as long as individuals with a staph infection keep their wounds covered and the surfaces they touched clean, there is a low risk that the infection will be transmitted. The jail's current policy of making cleaning supplies readily available 24 hours a day, seven days a week, for the inmates' use defeats any claim for relief on this basis, according to Defendants. The jails' current written policy regarding infectious diseases also requires instructions be given to inmates on how to use the soup, gauze, and tape provided them to care for their wounds.

FCDC's current physician, Dr. Eikenberg, provides treatment aimed at preventing the spread of staph infection, which policy comports with existing, known professional standards. In short, there is no evidence that the treatment of staph infections (including MRSA) with Epsom soaks, antibiotic ointment, soap, and covering the wound is "so

18

inadequate that it demonstrate[s] an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." Jones v. Drew, 2007 WL 737359, *4 (7th Cir. 2007). Those Defendants who themselves lack medical training were not and are not acting with deliberate indifference in relying on the expertise of the medical doctors and officers.

Clearly, greater precautions could be taken at FCDC to limit the onset and spread of staph infections. See Pls.' Exh. 2 listing methods of preventing transmission of staph. However, the fact that Plaintiffs cite additional measures that the FCDC could take to prevent the spread of infection is not sufficient to warrant a finding of deficiencies of constitutional proportion or the established legal entitlement to a preliminary injunction. As Dr. Reiger states, "It is not possible to anticipate every means through which []MRSA can be transmitted nor every corrective or preventive measure that can help stop an outbreak or prevent an outbreak from occurring." Pl.'s Exh. 2.

The evidence adduced by the parties at the hearing fails to establish by a preponderance, at least at this preliminary stage of the proceedings, that the current practices, policies, and procedures of the FCDC place an inmate at the FCDC at "substantial risk of serious harm," such as would violate the Eighth Amendment. Plaintiffs, therefore, have not established a likelihood of prevailing on the merits of their claims. Thus, Count IX of Plaintiffs' Complaint requesting the issuance of a preliminary injunction to prohibit Defendants "from following or enforcing such ordinances, regulations, policies, procedures, customs or usages and to conform their conduct to the

requisites of the Constitutions of the United States and Indiana and to applicable Indiana laws and regulations and to alleviate all jail conditions that contributed to the damages sustained by Plaintiffs and the class" must be DENIED. IT IS SO ORDERED.

Date: 07/31/2007

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Gregory A. Belzley
DINSMORE & SHOHL LLP
gregory.belzley@dinslaw.com

Robert Jeffrey Lowe
KIGHTLINGER & GRAY, LLP
jlowe@k-glaw.com

Robert Kenyon Meyer
DINSMORE & SHOHL LLP
kenyon.meyer@dinslaw.com

Richard T. Mullineaux
KIGHTLINGER & GRAY, LLP
rmullineaux@k-glaw.com

John R. Shelton
SALES TILLMAN WALLBAUM CATLETT & SATTERLEY
rshelton@stwlaw.com